JOHN P. FISKE (SBN 249256)
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel: 858.251.7424
Email:        fiske@baronbudd.com
*Attorneys for Plaintiff*
*Additional Counsel listed on Signature Page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

COUNTY OF SAN DIEGO, a political subdivision of the state of California

           Plaintiff,

      v.

3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); ANGUS FIRE; AGC CHEMICAL AMERICAS, INC.; AGC INC. F/K/A ASAHI GLASS CO.; ARCHROMA MANAGEMENT LLC; ARCHROMA US, INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE PROTECTION CO.; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD; CHEMICALS INC.; CHUBB FIRE, LTD.; CLARIANT CORP.; CORTEVA, INC.; DEEPWATER CHEMICALS, INC.; DOE DEFENDANTS, JOHN 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORP.; E.I. DU PONT DE NEMOURS & COMPANY; KIDDE-FENWAL, INC.; KIDDE PLC INC.; NATIONAL FOAM,

Case No.: **'22 CV1671 MMADEB**

**COMPLAINT AND JURY DEMAND**

1. Strict Liability-Design Defect-Consumer Expectation Test
2. Strict Liability-Design Defect-Risk Benefit Test
3. Strict Liability-Failure to Warn
4. Private Nuisance
5. Public Nuisance
6. Trespass
7. Negligence- Manufacturer or Supplier – Duty to Warn
8. Negligence-Failure to Recall
9. Violation of the Uniform Transfer Act
10. Civil Conspiracy

INC.; NATION FORD CHEMICAL
COMPANY; RAYTHEON
TECHNOLOGIES CORPORATION
F/K/A UNITED TECHNOLOGIES
CORPORATION; THE ANSUL
COMPANY; THE CHEMOURS
COMPANY; THE CHEMOURS
COMPANY FC, LLC; TYCO FIRE
PRODUCTS, LP; AND UTC FIRE &
SECURITY AMERICAS
CORPORATION,

          Defendants.

Plaintiff, County of San Diego ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), Kidde-Fenwal, Inc., Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Chemicals Americas, Inc., AGC, Inc., (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF THE CASE

1.    Plaintiff brings this action against Defendants to recover any and all past, present and future compensatory and/or consequential damages for the contamination, investigation, remediation, removal, decontamination, disposal, treatment, and monitoring

of the ongoing contamination of its surface water, groundwater, soil and sediment, diminished property value, punitive damages, attorneys' fees and costs, as well as any and all other damages available as a result of Defendants' products and the actions and/or inactions of Defendants.

2.      Plaintiff is a political subdivision of the State of California. Plaintiff is the owner of the McClellan-Palomar Airport located at 2198 Palomar Airport Road, Carlsbad, California, as well as lands, facilities, and equipment associated therewith.  The County also owns and operates, or has some responsibility for, twelve landfills located throughout the County.  This Complaint refers to the airport, the landfills, and associated property, soil, groundwater, facilities, and equipment collectively as "Plaintiff's Property."

3.      McClellan-Palomar Airport is a Class I Federal Aviation Administration ("FAA") Part 139 certified facility, providing general aviation and commercial service. The Airport is home to an onsite Aircraft Rescue and Firefighting (ARFF) facility that operates two ARFF vehicles.

4.      In 2019, pursuant to orders from the California State Water Resources Control Board, Plaintiff began an investigation into the potential presence of per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), in the groundwater and soil at Plaintiff's Property. PFOA, PFOS, and perfluorohexanesulfonic acid ("PFHxS") were detected in samples taken from Plaintiff's Property.

5.      PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

6.      Aqueous film-forming foam (AFFF) is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.  AFFF contains PFAS including PFOA and PFOS.  AFFF was stored and used at McClellan-Palomar Airport.

COMPLAINT AND JURY DEMAND

7.     At various times from the 1960s through today, Defendants designed, manufactured, formulated, marketed, distributed, and/or sold PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or AFFF containing PFOA, PFOS and/or their chemical precursors (collectively, "Fluorosurfactant Products").

8.     Defendants designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by the Defendants.

9.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at or near Plaintiff's Property for fire protection, training, and response activities.  During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

10.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFOS, PFOA, and/or their chemical precursors have been detected on Plaintiff's Property at substantial levels.

11.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

12.     At all times pertinent herein, Plaintiff did not know, nor should Plaintiff have known, of the ongoing contamination of its Property through the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

13.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for the contamination and all past, present and future costs to investigate, remediate, remove, decontaminate, dispose of, treat, and monitor the PFAS

COMPLAINT AND JURY DEMAND

contamination of Plaintiff's Property caused by the use of Defendants' Fluorosurfactant Products on Plaintiff's Property, as well as any and all other damages recoverable under California and/or applicable federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as punitive damages and reasonable attorneys' fees and costs.

## PARTIES

14.    Plaintiff County of San Diego is a political subdivision of the State of California, with its principal address located at 1600 Pacific Highway, San Diego, California, 92101.

15.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

1.    Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in California, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including California.

2.    Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont is registered to do business in the State of California.

3.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in the State of California.

COMPLAINT AND JURY DEMAND

4.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

5.    Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in- interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in the State of California.

6.    Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

7.    Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in California.

8.    Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard does and/or has done business throughout the United States, including in the State of California.

9.    Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of California.

10.   Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011.

11.   Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in the State of California.

12.   Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire"). Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in the State of California.

COMPLAINT AND JURY DEMAND

13. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in the State of California.

14. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

15. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in California.

16. Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in California.

17. Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm

COMPLAINT AND JURY DEMAND

Springs Road, Farmington, Connecticut 06032. Raytheon Tech f/k/a United Tech is registered to do business in California.

18.   Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products. National Foam does and/or has done business throughout the United States, including in the State of California.

19.   Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye is registered to do business in California.

20.   Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in California.

21.   Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is registered to do business in California. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including California.

22.   Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

23. Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in California.

24. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Chem Inc. is registered to do business in California.

25. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

26. Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do business in California

27. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

28. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

29. Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this

COMPLAINT AND JURY DEMAND

Defendant manufactured Fluorosurfactant Products for use in AFFF.

30. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

31. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Archroma U.S., Inc. does business throughout the United States, including California.

32. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

16. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

17. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged

in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION

18.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and all Defendants.  Plaintiff is located in California, but no Defendant is a citizen of California.

19.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## FACTUAL ALLEGATIONS

### A. THE CONTAMINANTS: PFOA & PFOS

20.     PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

21.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

---

[1] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R- 16-005 (May 2016) at 16, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_health_advisory_final-plain.pdf (last accessed October 21, 2022); and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_health_advisory_final-plain.pdf (last accessed October 21, 2022).

22.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

23.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

24.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

25.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

26.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

27.     EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies,

---

[2] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16- 004 (May 2016) at 19-21, 26 28.

[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

[4] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (last accessed October 21, 2022).

[5] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf(last accessed October 21, 2022).

COMPLAINT AND JURY DEMAND

"such contamination is typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[6]

28.     Regulatory standards are trending downwards as the science develops.   In 2016, EPA [7] issued Health Advisory Levels ("HA"s) of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water.   In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).  EPA therefore announced new Interim Updated Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[8]

29.     In December 2019, the EPA has also issued interim recommendations for addressing groundwater contaminated with PFOA and PFOS at sites being evaluated and addressed under federal cleanup programs.  The guidance recommends using a screening level of 40 parts per trillion to determine if PFOA and/or PFOS is present as a site and may warrant further attention, and recommends using the Lifetime Drinking Water Health Advisory level of 70 parts per trillion as the preliminary remediation goal.[9]

---

[6] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health- advisories-pfoa-and-pfos.

[7] See EPA, "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number 822-F-22-002, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf (last accessed October 21, 2022).**Error! Hyperlink reference not valid.**

[8] See EPA "Drinking Water Health Advisories for PFOA and PFOS, available at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos (last accessed October 21, 2022).

[9] See EPA, "Interim Recommendation for Addressing Groundwater Contaminated with PFOA and PFOS," OLEM Directive Number 9283.1-47, available at https://www.epa.gov/pfas/interim-recommendations-addressing-groundwater-contaminated-pfoa-and-pfos (last accessed October 21, 2022).

30.     The State of California's Division of Drinking Water established notification levels of 6.5 ppt for PFOS and 5.1 ppt for PFOA, and lowered the State's response levels from 70 ppt for PFOS and PFOA, to 40 ppt for PFOS and 10 ppt for PFOA.[10]

## B. AQUEOUS FILM FORMING FOAM

31.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

32.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

33.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").  PFHxS is formed during this process.

34.     All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

35.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

36.     AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion.

---

[10] *See* California State Water Resources Control Board, PFAS Regulations in California Drinking Water, available at
https://www.waterboards.ca.gov/drinking_water/certlic/drinkingwater/pfas.html (last accessed October 21, 2022).

COMPLAINT AND JURY DEMAND

37.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

38.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

39.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

40.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

**C. DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS**

41.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

42.     Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

43.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a

COMPLAINT AND JURY DEMAND

person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[11]

44.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

45.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[12]

46.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[13]

47.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

48.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick

---

[11] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed October 21, 2022).
[12] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed October 21, 2022).
[13] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades (last accessed October 21, 2022).

COMPLAINT AND JURY DEMAND

cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

49.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

50.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[14]

51.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[15] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[16]

52.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[17]

---

[14] *See, e.g.*, Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). *The Wilmington News Journal* is published in Wilmington, Ohio.
[15] $16.5 million.
[16] U.S.Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental  (last accessed on October 21, 2022).
[17] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

COMPLAINT AND JURY DEMAND

between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[18] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

53.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

54.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Plaintiff's Property; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

55.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's Property has been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and

---

[18] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July 2011.pdf  (last accessed on October 21, 2022).

COMPLAINT AND JURY DEMAND

remediate PFOA and PFOS contamination on its Property at significant expense, loss, and damage.

56.    Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

### D.  THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY

57.    PFAS, including PFOA, PFOS, and PFHxS have been detected and/or are present on Plaintiff's Property. The detection and/or presence of PFOA, PFOS, and PFHxS, and the threat of further detection and/or presence of PFOA, PFOS, and PFHxS, in Plaintiff's Property has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

58.    Upon information and belief, the invasion of Plaintiff's Property with PFOA and PFOS is recurring, resulting in new harm to Plaintiff on each occasion.

59.    The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

### FIRST CAUSE OF ACTION

### STRICT LIABILITY – DESIGN DEFECT – CONSUMER EXPECTATION TEST

60.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

61.    Plaintiff was harmed by Fluorosurfactant Products which were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were

defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

62. Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

63. Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

64. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

65. Defendants' Fluorosurfactant Products used on or in the vicinity of Plaintiff's Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

66. Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater.

67. Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

68. Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

69. Defendants' Fluorosurfactant Products' failure to perform safely was a substantial factor in causing Plaintiff's harm.

COMPLAINT AND JURY DEMAND

70.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY – DESIGN DEFECT – RISK BENEFIT TEST

71.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

72.    Plaintiff was harmed by Fluorosurfactant Products designed, manufactured, marketed, sold and/or distributed by Defendants.

73.    Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

74.    The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiff.

75.    The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent, and toxic.

76.    The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

77.    At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

COMPLAINT AND JURY DEMAND

78.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

79.     As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## THIRD CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

80.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

81.     As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

82.     Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

83.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

84.     Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiff's Property.

COMPLAINT AND JURY DEMAND

85.    Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

86.    Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiff's Property were defective in design and unreasonably dangerous for the reasons set forth above.

87.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products on or near Plaintiff's Property, including contamination of Plaintiff's Property with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

88.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

89.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## FOURTH CAUSE OF ACTION

### PRIVATE NUISANCE

90.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

91.    Under California law, "anything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere

with the comfortable enjoyment of life or property ... is a nuisance." [19]

92.     Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a nuisance that is injurious to health and obstructs the free use and enjoyment of Plaintiff San Diego County's Property.

93.     Defendants, by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and threat of contamination to Plaintiff's Property.

94.     Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of its Property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

95.     The California State Water Resources Control Board, has ordered Plaintiff to investigate and report the potential presence of PFAS, including PFOA and PFOS, in the groundwater and soil at Plaintiff's Property.

96.     The presence of PFAS, including PFOA and PFOS, in the groundwater and soil at Plaintiff's Property causes significant costs, inconvenience and annoyance to Plaintiff, who is charged with monitoring, and potentially reducing, the presence of PFAS in groundwater and soil in order to protect animal and human life, and the quality of drinking water in San Diego County.

97.     The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in the use and introduction of their Fluorosurfactant Products into the environment and concealing the dangers posed to human health and the environment.

[19] Cal. Civ. Code § 3479.

98.     Plaintiff did not consent to the conduct that resulted in the PFAS contamination of Plaintiff's Property.

99.     Defendants' conduct was a substantial factor in causing the harm to the Plaintiff.

100.    Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably, and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property by Plaintiff.  As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## FIFTH CAUSE OF ACTION

### PUBLIC NUISANCE

101.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

102.    Under California law, "anything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance." "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

103.    Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a public nuisance that that is injurious to health and obstructs the free use of Plaintiff San Diego County's Property.

COMPLAINT AND JURY DEMAND

104.   Defendants, by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFOA and/or PFOS contamination and threat of contamination to Plaintiff's Property.

105.   Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of its Property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

106.   The California State Water Resources Control Board, has ordered Plaintiff to investigate and report the potential presence of PFAS, including PFOA and PFOS, in the groundwater and soil at Plaintiff's Property.

107.   The presence of PFAS, including PFOA and PFOS, in the groundwater and soil at Plaintiff's Property causes significant costs, inconvenience and annoyance to Plaintiff, who is charged with monitoring, and potentially reducing, the presence of PFAS in groundwater and soil in order to protect animal and human life, and the quality of drinking water in San Diego County.

108.   Defendants' conduct has also injured, and continues to injure, the property, health, safety, and/or comfort of a considerable number of persons, including a considerable number of persons in San Diego County, California, such as those who use drinking water impacted by PFAS contamination in soil and groundwater.

109.   The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in the use and introduction of their Fluorosurfactant Products into the environment and concealing the dangers posed to human health and the environment.

110.   Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs

deriving from the required investigation and potential remediation of PFAS contamination on Plaintiff's Property.

111. Plaintiff did not consent to the conduct that resulted in the PFAS contamination of Plaintiff's Property.

112. Defendants' conduct was a substantial factor in causing the harm to the Plaintiff.

113. Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their Fluorosurfactant Products into the environment would and has continuously, unreasonably, and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property by Plaintiff. As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## SIXTH CAUSE OF ACTION

### TRESPASS

114. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

115. Plaintiff is the owner and/or actual possessor of Plaintiff's Property and other relevant structures located thereon. Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Plaintiff.

116. Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Plaintiff's Property, including but not limited to its soil, sediment, surface water, groundwater, and other structures located thereon.

COMPLAINT AND JURY DEMAND

117.   The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOA and/or PFOS continue to migrate onto and enter Plaintiff's Property. The contamination is reasonably abatable.

118.   Plaintiff has not consented to, and does not consent to, this trespass or contamination.

119.   Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

120.   Plaintiff was, is, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto its Property.

121.   As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## SEVENTH CAUSE OF ACTION

NEGLIGENCE – MANUFACTURER OR SUPPLIER – DUTY TO WARN

122.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

123.   As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

124.   Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled,

labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

125.   A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

126.   Plaintiff was, is, and will continue to be harmed.

127.   Defendants' failure to warn or instruct was a substantial factor in causing Plaintiff's harm.

128.   Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

129.   As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

# **EIGHTH CAUSE OF ACTION**

## NEGLIGENCE – FAILURE TO RECALL

130.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

131.   Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed and sold without adequate warning of toxicity, potential human health risks and environmental hazards.

132.   Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

133.   Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

134.   Defendants knew or reasonably should have known that users and third parties would not realize the dangers.

135.   Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000.

136.   Defendants failed to recall their Fluorosurfactant Products.

137.   A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant Products.

138.   Plaintiff was, is, and will continue to be harmed.

139.   Defendants' failure to recall their Fluorosurfactant Products was a substantial factor in causing Plaintiff's harm.

140.   Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

141.   As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and diminished property value.

## **NINTH CAUSE OF ACTION**

### VIOLATION OF THE UNIFORM VOIDABLE TRANSFER ACT

142.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

143.   Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UVTA") as adopted by the State of California in Cal. Civ. Code Ann. § 3439, against E. I. Dupont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UVTA Defendants").

144.   Pursuant to Cal. Civ. Code Ann. § 3439, "[a] transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

1.   With actual intent to hinder, delay, or defraud any creditor of the debtor;

2.   Without receiving a reasonably equivalent value in exchange for the transfer or obligation of the debtor either:

   a.   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

COMPLAINT AND JURY DEMAND

b.   Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

145.   Further, Cal. Civ. Code Ann. § 3439 states that, "[i]n determining the actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any and all of the following: to all relevant factors including, but not limited to, the following: [...] whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, whether the transfer was of substantially all of the debtor's assets; [...] whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

146.   Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

147.   Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

148.   Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

149.   Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

COMPLAINT AND JURY DEMAND

150.   Upon information and belief, the UTVA Defendants acted (a) with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

151.   The UVTA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties, such as the Plaintiff, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions as described in this Complaint.

152.   As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

153.   Pursuant to Cal. Civ. Code Ann. § 3439.07, Plaintiff seeks to avoid the transfer of E.I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

154.   Plaintiff further seeks all other rights and remedies that may be available to it under UVTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## **TENTH CAUSE OF ACTION**

### CIVIL CONSPIRACY

155.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

156.   At all times relevant herein, Defendants actually knew of the hazards that PFOS and/or PFOA posed to the environment, including Plaintiff's Property.

157.   Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to the Plaintiff. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about Fluorosurfactant Products to the public and the government, with the true, unlawful purposes of:

1.   intentionally misrepresenting to the EPA and the public that their Fluorosurfactant Products were safe and did not pose a risk to human health and the environment;

2.   concealing the dangers of their Fluorosurfactant Products, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how Fluorosurfactant Products were being disposed of;

3.   concealing the dangers of PFOA and/or PFOS from consumers and the public; and

4.   using their considerable resources to fight legislation concerning PFOA and/or PFOS.

158.   As a direct and proximate result of Defendants' conspiracy, Defendants' Fluorosurfactant Products at all times relevant to this litigation have:

1.   posed and continue to pose a threat to Plaintiff's Property;

2.   contaminated and will continue to contaminate Plaintiff's Property;

3.   contaminated and will continue to contaminate the soil, surface water, and groundwater on and within the vicinity of Plaintiff's Property;

4. required and will continue to require testing and monitoring of Plaintiff's Property for PFAS contamination;

5. required or will require remediation of PFAS contamination, or where remediation is impracticable or insufficient for Plaintiff, removal, and disposal of the contamination;

6. diminished Plaintiff's confidence in, and the use and enjoyment of, Plaintiff's Property;

7. diminished Plaintiff's Property value due to actual, impending, and/or threatened PFAS contamination; and

8. caused and/or will cause Plaintiff to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit, and/or enjoyment of its Property.

## **PUNITIVE DAMAGES**

159. Under the applicable laws of the State of California, Plaintiff seeks punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

   a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

   b. costs and expenses related to the past, present, and future treatment, and remediation of PFAS contamination of Plaintiff's Property;

   c. costs and expenses associated with and related to the removal and disposal of the contamination;

  d. costs and expenses related to the past, present, and future installation, and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property; and

  e. any and all costs and expenses associated with the decontamination of Plaintiff's equipment;

2. Diminished property value;

3. Any and all past, present or future costs, expenses, and/or damages assessed against Plaintiff for contamination caused by the actions and/or inactions of Defendants as set forth herein;

4. Consequential damages;

5. Punitive damages;

6. Costs, disbursements, and attorneys' fees of this lawsuit;

7. Pre-judgment and post-judgment interest; and

8. Any other and further relief as the Court deems just, proper, and equitable.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT AND JURY DEMAND

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

Dated:  October 26, 2022                    **BARON & BUDD, P.C.**

                                   By:   /s/ John P. Fiske
                                        JOHN P. FISKE (SBN 249256)
                                        JASON JULIUS (SBN 249036)
                                        **BARON & BUDD, P.C.**
                                        11440 West Bernardo Court, Suite 265
                                        San Diego, CA 92127
                                        Tel: 858.251.7424
                                        fiske@baronbudd.com
                                        jjulius@baronbudd.com
                                        **BARON & BUDD, P.C.**
                                        Scott Summy (TX Bar 19507500)
                                        *Pending Pro Hac Vice*
                                        Carla Burke Pickrel (TX Bar 24012490)
                                        *Pending Pro Hac Vic*
                                        3102 Oak Lawn Avenue, Suite 1100
                                        Dallas, TX 75219
                                        Tel.: 214-521-3605
                                        ssummy@baronbudd.com
                                        cburke@baronbudd.com

                                        **COSSICH, SUMICH, PARSIOLA &
                                        TAYLOR, LLC**
                                        Philip F. Cossich, Jr. (LA Bar 1788)
                                        *Pending Pro Hac Vice*
                                        Brandon J. Taylor (LA Bar 27662)
                                        *Pending Pro Hac Vice*
                                        Christina Cossich (LA Bar 32407)
                                        *Pending Pro Hac Vice*
                                        8397 Highway 23, Suite 100
                                        Belle Chasse, LA 70037
                                        Telephone: (504) 394-9000
                                        Fax: (504) 394-9110

                                        *Attorneys for Plaintiff*

COMPLAINT AND JURY DEMAND